gation of the licensor to allow the use of his name is indispensable to the enjoyment by the licensee of the monopoly which by personal contract the licensor has given. Inconvenience and possibly embarrassing adjudication in respect to the validity of the licensor's patent rights, as the result of suits begun in aid of the licensee, are only the equitable and inevitable sequence of the licensor's contract, whether express or implied."

It further said, 269 U.S. at page 473, 46 S.Ct. at page 171:

"The objection by the defendant that the name of the owner of the patent is used as a plaintiff in this suit without authority is met by the obligation the owner is under to allow the use of his name and title to protect all lawful exclusive licensees and sub-licensees against infringers, and by the application of the maxim that equity regards that as done which ought to be done. Camp v. Boyd, 229 U.S. 530, 559, 33 S.Ct. 785, 57 L.Ed. 1317; United States v. Colorado Anthracite Co., 225 U.S. 219, 223, 32 S.Ct. 617, 56 L.Ed. 1063; Craig v. Leslie, 3 Wheat. 563, 578, 4 L.Ed. 460. The court should on these grounds refuse to strike out the name of the owner as coplaintiff put in the bill under proper averment by the exclusive licensee.

"The owner beyond the reach of process may be made coplaintiff by the licensee, but not until after he has been requested to become such voluntarily. If he declines to take any part in the case, though he knows of its imminent pendency and of his obligation to join, he will be bound by the decree which follows. * * * " ·

As stated, this was a suit between private individuals, but E. W. Bliss v. United States, supra, says that section 1498 embraced within the word "owner" a person who had "at least such an interest in the patent as without the stat-

ute would support such a suit against a defendant other than the United States."

Under the holding of these two cases, therefore, it would seem to follow, necessarily, that an exclusive licensee, subject to the stated reservation, is an "owner" in the sense that word is used in section 1498, and as such is entitled to sue infringers for damages, and that it has the right to join as a party plaintiff the patentee or his assignee, notwithstanding the refusal of the assignee to give its assent thereto.

For the reasons stated, in addition to those given by the Commissioner in his opinion, we hold that plaintiff Wing Engineering Corporation has the capacity to maintain this suit. The intervenors' petitions will be dismissed.

These cases will be remanded to the Commissioner for further proceedings not inconsistent with this opinion.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.

**ATLANTIC CRUSHED COKE COMPANY.**

v.

**The UNITED STATES.**

No. 124-54.

United States Court of Claims.

May 8, 1957.

Gilbert J. Helwig, Pittsburgh, Pa., for plaintiff. Charles E. Kenworthey, Pittsburgh, Pa., was on the brief.

Thomas L. McKevitt, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff alleges that the defendant, by the construction of a dam on the Conemaugh River in Pennsylvania, deprived it of the use of its mine, for which it seeks just compensation.

The dam was constructed for flood control and, hence, defendant cannot escape liability if it, in fact did deprive plaintiff of the use of its mine.

Adjacent to the river is the Isabella mine, operated by the Westmoreland Mining Company; in the rear of the Isabella mine, facing from the river, is the Breniser mine, also operated by the Westmoreland Mining Company. Plaintiff's mine is in the rear of the Breniser mine.

There is a drain pipe from the Isabella mine at elevation 931 m. s. l., installed for the purpose of draining the water out

of that mine; later an opening was cut between the Isabella and the Breniser mines at elevation 944, to drain the water out of the Breniser mine.

The normal pool elevation behind the dam erected by the defendant on the Conemaugh River is from 880 to 890 feet, but the top of the dam is at elevation 948 feet, and, later, gates were installed on the top of the dam, which raised the possible elevation of the water behind the dam to 975 feet.

Based upon the past record of floods on this river, a flood elevation of 975 feet is to be expected only once in 180 years. A flood elevation of 948 feet can be expected approximately every 2.7 years, and a water elevation of 931 feet could be expected about once a year.

About once a year, therefore, water impounded behind the dam, if of sufficient duration, could back up through the drain pipe and flood the Isabella mine, and about once every two and a half years there is to be expected a flood which would raise the reservoir above the normal elevation of the water in the Breniser mine. Because of this possibility, and because, supposedly, he was of the opinion that the coal barrier between the Breniser mine and plaintiff's mine was not sufficient to withstand the pressure of the water in the Breniser mine when it exceeded elevation 944, a mine inspector of the Commonwealth of Pennsylvania ordered plaintiff to discontinue mining below elevation 950.

The inspector notified the Secretary of Mines of the Commonwealth of Pennsylvania of this order, but said:

"There is no immediate danger in any of the above mentioned mines. If any of the companies object to my orders, I shall ask that a commission be appointed by you. It may be that the coal between 950 and 975 can be worked under a later agreement during low water, provided ample warning is given all concerned before the flood gates are closed."

A commission was appointed to consider the matter, and after an informal hearing, it entered an order prohibiting mining below elevation 975 feet, after the installation of the gates; but the order stated:

"At a later date, it may be possible that the commission will modify the above requirements, provided an agreement, satisfactory to the commission, can be reached between the Corps of Engineers, U. S. Army, and the Atlantic Crushed Coke Company, whereby an authorized representative of the Corps of Engineers, U. S. Army, will accept the responsibility to notify an authorized representative of the Seger mine in sufficient time to provide for the safety of the persons in and about the Seger mine and the protection and preservation of the property connected therewith."

This order was issued on June 2, 1952.

Plaintiff alleges that this order was "made necessary because of the threatened flooding of plaintiff's Seger mine by waters impounded behind the Conemaugh Dam," and, therefore, it says that the Government, by the erection of the dam, took its coal property.

■ Defendant cannot be said to have taken plaintiff's property unless, as the natural and necessary consequence of the erection of this dam, plaintiff would be prevented from mining coal in its mine below the top elevation of the dam. Hortsmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171; Columbia Basin Orchard v. United States, 132 F. Supp. 707, 132 Ct.Cl. 445. Water would necessarily flow into the Isabella mine and into the Breniser mine, and up against the barrier between the Breniser mine and plaintiff's mine whenever the water in the pool behind the dam exceeded 944 feet m. s. l. for a sufficient time to reach the barrier; but would this result in a breach in the barrier between the Breniser mine and plaintiff's mine and the consequent flooding of plaintiff's mine; or would the danger of such a

breach be so great as to probably cause the Commonwealth of Pennsylvania to prohibit the mining of coal below the elevation of the top of the dam?

Plaintiff says that the possible flooding of its mine is not open to question, because the Secretary of Mines of the Commonwealth of Pennsylvania has determined that there is such a possibility, and that the danger of such a flooding is so imminent as to make it necessary to prohibit the mining of coal in that mine below the elevation of the top of the gates on top of the dam.

But, can we say, under the facts of this case, that the defendant must have known that the Secretary of Mines would issue such an order? Can we say that the defendant must have known that the barrier between the Breniser mine and plaintiff's mine was so clearly insufficient to keep plaintiff's mine from being flooded, that it must have known that this order would be issued?

We are of the opinion that the proof does not show that the defendant must have known this. There is in the evidence the testimony of two qualified engineers that the barrier between plaintiff's mine and the Breniser mine was sufficient to withstand any water pressure from the raising of the water in the pool of the dam to its highest level. One of these engineers is a member of one of the best qualified mining engineering firms in the country. He testified there is no possible danger of a breach in this barrier from water pressure from the dam. The other engineer, who had been in the employ of the Breniser mine, corroborates his testimony.

The normal level of the water in the Breniser mine was 944 feet and, hence, before the erection of the dam, the barrier between the two mines was subjected, normally, to water pressure to the extent that the level of the water in plaintiff's mine fluctuated above or was reduced below 944 feet. Any added pressure caused by the erection of the dam could not exceed 13 and a fraction pounds per square inch.[1] At the time of the erection of the dam, mining operations in plaintiff's mine were being carried on at 930 feet. The total maximum water pressure on the barrier at this elevation, after the erection of the dam, would be 19.35 pounds per square inch, of which .6 pounds would be due to the water normally standing in the Breniser mine.

As against this 19.35 pounds, the barrier had withstood a water pressure of 40.85 pounds in 1945, and of 66.65 pounds in 1937.

If the water in plaintiff's mine was reduced to its lowest point, the maximum water pressure from flood waters and the normal waters in the Breniser mine would be 51.6 pounds per square inch.

The barrier between plaintiff's mine and the Millwood mine, which is in the rear of plaintiff's mine, facing from the river, is thinner than the barrier between plaintiff's mine and the Breniser mine; yet, the pressure of the water in the Millwood mine on the barrier between that mine and plaintiff's mine, at elevation 944 feet, would be 24 pounds per square inch, as contrasted with 13 and a fraction pounds per square inch on the Seger-Breniser barrier, when the water in the pool behind the dam is at maximum elevation of 975 feet.[2] The water pressure from the Millwood mine, although greater than the pressure from the flood waters behind the dam, and although the barrier was thinner, had not caused the Secretary of Mines to order a cessation of work in plaintiff's mine.

In view of these facts, it seems to us the defendant had no reason to expect that the Secretary of Mines of the Commonwealth of Pennsylvania would hold that the barrier between plaintiff's mine and the Breniser mine was so insufficient as to make it necessary for him to pro-

1. Maximum dam elevation 975 feet, less normal Breniser elevation 944, equals 31 feet. This, multiplied by factor .43, equals 13.3 pounds per square inch pressure.

2. For further comparison of the pressure on the two barriers at different elevations, see finding 10.

hibit the working of plaintiff's mine below elevation 975 feet.

██ It is nevertheless true that such an order was issued and remains in effect. However, we do not think that plaintiff can say that by this order it has been prevented from working its mine. Section 771 of Title 52 of Purdon's Pennsylvania Statutes provides for an appeal to the Quarter Sessions Court from any action of a commission appointed by the Secretary of Mines. No such appeal was taken. We are of opinion plaintiff is not unable to work its mine so long as there is open to it means for securing a revocation of the order prohibiting the working.

Moreover, the order of the commission, dated June 2, 1952, stated that its prohibition against working the mine might be modified, if a satisfactory agreement could be worked out between plaintiff and the Corps of Engineers, U. S. Army, to warn plaintiff's representatives of expected flood waters in sufficient time to provide for the safety of the persons in the mine.

Immediately after the issuance of this order on June 2, 1952, defendant undertook to enter into such an agreement with plaintiff, but it could not get plaintiff to even discuss such an agreement. Later, the commission, on November 10, 1952, again notified the parties that they would consider modification of their order, if a warning agreement could be entered into. Finally, on May 13, 1953, the parties had a conference for the purpose of discussing such an agreement, and on May 29, 1953, defendant mailed to plaintiff a draft of such an agreement. Plaintiff made no reply for seven months, and then on December 31, 1953 it wrote defendant, saying:

" * * * We have been unable to convince ourselves that the system of warning therein provided for [in the agreement drafted by the defendant], or any system of warning which could be devised in the circumstances, could provide adequate protection for the lives of our employees. The finding and order of the Pennsylvania Mining Commission has long since become final and even if it were possible to obtain a revocation of that order, we could not, in good faith, undertake to procure it.

"Under the circumstances, we have no alternative but to institute proceedings in the Court of Claims of the United States in order to obtain compensation for the coal in the Seger Mine, to which we have been denied access, because of the construction and operation of the Conemaugh Dam."

It thus appears that plaintiff made no *bona fide* effort to enter into an agreement with the defendant to make it possible for it to operate its mine. Insofar as the record shows, the plaintiff never took up with the commission the draft of the agreement proposed by the defendant. Instead, it said that no agreement could be arrived at which would afford adequate protection and, thus, declined to discuss the matter further, and said it proposed to rely upon a taking of its property by the defendant.

Of course, there was no taking if plaintiff could continue to extract coal from the mine to the same extent and with the same ease as before the erection of the dam. Plaintiff has not shown it could not do so, because, first, it has not shown that the order of the Secretary of Mines could not have been set aside. If set aside, it could have extracted the coal to the same unrestricted extent as before.

In the second place, plaintiff has not shown it could not mine coal as before, because it has not shown that defendant's proposed agreement for warning would not have been approved by the Secretary of Mines, or, if not this agreement, then some other agreement. If approved, permission might have been given to mine coal as before.

If permission had been given to mine coal as before, then there would have been no taking.

The cessation of mining was not the result of disapproval of the agreement,

but of plaintiff's refusal to agree to anything.

It is difficult to escape the conclusion that plaintiff did not want to continue mining its property,[3] and welcomed the order to cease operation, as the basis of a claim of a taking.

Plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

## NORTH COUNTIES HYDRO-ELECTRIC COMPANY

v.

## The UNITED STATES.

No. 268-53.

United States Court of Claims.
May 8, 1957.

John W. Day, Chicago, Ill., for plaintiff.

Ralph S. Boyd, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

This is an action by plaintiff for the taking of its hydro-electric power plant on the Fox River in Illinois. It is before us on defendant's pleas of res adjudicata and the statute of limitations

3. The mine was shut down in 1953, and leased in 1954.