**293.080 ACRES OF LAND,** more or less, SITUATE IN WESTMORELAND COUNTY, Commonwealth of PENNSYLVANIA, and Stanley Sulkosky, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 12986 (T–1605–A), 12987 (T–1605–B), 12988 (T–1605–C), 12989 (J–846).

United States District Court
W. D. Pennsylvania.

Jan. 9, 1959.

John Gavin, Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

Albert M. Nichols, Greensburg, Pa., Thomas L. Wentling, B. A. Karlowitz, Patterson, Crawford, Arensberg & Dunn, Pittsburgh, Pa., for plaintiffs.

WILLSON, District Judge.

These cases are before the court on exceptions filed by the United States to an award in plaintiffs' favor in the aggregate sum of $33,500 made by three commissioners in land condemnation proceedings. The Commission was appointed by this court under Rule 71A of the Federal Rules of Civil Procedure, 28 U.S.C. The Commission held hearings, took testimony and received other evidence, viewed the condemned property and in due course filed its report containing findings of fact and conclusions of law. The exceptions filed by the United States are timely and will be considered as objections as provided in Rule 53(e) (2). Although six objections were filed, the Government makes three contentions:

1. Plaintiffs' witnesses who testified to value were not qualified to so testify.

2. The Commission's findings as to value are based upon improper and erroneous measures of value.

3. The amount of the award was contrary to and against the weight of the evidence.

The United States requests a new trial or in the alternative that a remittitur be entered reducing the amount of the awards.

At the outset it is noticed that Rule 71A(h) provides that when a Commission is appointed, it shall have the powers of a master as provided in subdivision (c) of Rule 53. Its action and report shall be determined by majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the practice prescribed in paragraph (2) of subdivision (e) of Rule 53. Rule 53 requires the court to accept the Commissioner's findings of fact unless clearly erroneous. It also provides that the court after hearing may adopt the report, or may modify it or may reject it in whole or in part, or may receive further evidence or may recommit it with instructions.

A hearing has been had on the Government's objections, counsel have been heard at oral argument and have filed briefs which have been considered. The court suggested and Government counsel has supplied, as evidence for the record, information as to the time of completion of the dam proper and time of the installation of the top gates of the Conemaugh Dam. This additional evidence in no wise affects the findings or the report of the Commission.

The plaintiffs are the owners of three contiguous tracts of subsurface coal property which were operated by them as a single coal mine, and Sulkosky and his wife own a fourth tract on which he operates a dairy farm. The Government concedes that title to the properties is not in dispute and is in plaintiffs.

The condemnation by the Government is pursuant to various acts of Congress, particularly the Flood Control Act of Congress, approved June 28, 1938, 52 Stat. 1215, 33 U.S.C.A. § 701b et seq., and other acts which authorized the construction, operation and maintenance of the Conemaugh Dam and Reservoir on the Conemaugh River, Pennsylvania, Ohio River Basin. Easements only were taken in these cases. The declaration of taking sets out that the estates taken for public uses are as follows:

> "3(a) The perpetual right and easement to flood all the coal and mining rights in the Pittsburgh Vein or Seam in and underlying Tracts T–1605A, T–1605B and T–1605C, Conemaugh River Reservoir Project, as may be necessary and

as is affected by and resulting from the construction, operation and maintenance of the Conemaugh River Dam and Reservoir, subject, however, to existing easements for public roads, streets, highways, public utilities, railroads and pipelines.

"Reserving, however, to the owners of said coal and mining rights, their heirs and assigns, all such rights and privileges that may be used and enjoyed in said property, subject, however, to the right of the United States to flood the same as aforesaid.

"(b) The perpetual right and easement to flood tract J–846 as may be necessary by means of the construction, operation and maintenance of the Conemaugh Dam and Reservoir, and to clear by destruction and/or removal of trees, brush, fences, crops, buildings and any other vegetation, structures, or obstacles which may be detrimental to the operation and maintenance of said dam and reservoir, subject, however, (a) to all coal underlying said tract which became vested in the Maher and Graff Coal Company by deed from Thomas Maher et al. dated 5 November 1927 and recorded in the Recorder's office of Westmoreland County, Pennsylvania, in Deed Book Volume 865, page 203; (b) to the outstanding interest of third party lessee in the underlying oil and gas in said tract; and (c) to existing easements for public roads, streets, highways, public utilities, railroads and pipelines.

"Excepting and reserving from the easement herein taken in Tract J–846, all the oil, gas and other minerals underlying said tract;

"Reserving, however, to the owners of said Tract J–846, their heirs and assigns, all such rights and privileges that may be used and enjoyed in said land without interfering with or abridging the rights, privileges and easements acquired by the United States of America in this proceeding; provided, however, that no improvements, structures and obstructions of any kind shall be placed or constructed upon or within the said easement area without the prior written consent and approval of the United States; and

"Reserving further to the owners, their heirs and assigns, the right to maintain two powder magazines on said tract, subject to the right of the United States to flood the same."

In the Complaint, however, the Government says that the estate taken, that is with regard to the coal, is the perpetual right and easement to flood all the coal or mining rights in the Pittsburgh vein or seam in and underlying Tracts T–1605A, T–1605B and T–1605C, Conemaugh River Reservoir Project, as may be necessary and as is affected by and resulting from, etc. The Commission awarded damages to the landowners in the sum of $30,000 for the coal mine and $3,500 for the damages resulting from the flowage easement on the farm, Tract J–846, distributed among the various owners.

The easements acquired by the Government in these cases are in nearly all respects similar to the flowage easements acquired by the Government in two cases before the Court of Appeals of the Fourth Circuit, United States v. 2,648.31 Acres of Land, 218 F.2d 518, and United States v. 2979.72 Acres of Land, 218 F. 2d 524, in which the decisions were written by the late Chief Judge Parker. He discussed the law and indicated the measure of damages to be used in determining just compensation to the landowner. He said, at page 523:

"It is perfectly clear that all the government sought to acquire or did acquire by the taking here was an easement to flood the land for the purpose of the flood control dam, and we think it a clear case for the application of the rule that 'where only an easement is taken, the fact that the fee remains in the landowner must be taken into consideration,

the entire fee or rental value not being recoverable.' 20 C.J. p. 758, 29 C.J.S. Eminent Domain § 152, page 1011. 'When land is flowed for the development of water power, the owner's damage for its taking is measured by the difference between the value of his land after the condemnor has flowed it and what it would have been worth on the date of its taking if the defendant's dam had not been built; that is the difference between the value of the land free from, and subject to the rights taken.' 18 Am.Jur. 890."

In the second decision, page 524, Judge Parker, however, is discussing a set of facts more analogous to the factual situation in the instant cases. What was taken in the second case before Judge Parker was the right to flood permanently the entire 1540 acres of land, leaving no interest of any value to the owner of the prior easement. He then said, page 525:

"  *  *  *  The trial judge was justified, therefore, in valuing the flowage rights of the power company over the 1540 acres which were destroyed by the government's taking as being measured by the fee simple value of the land which would be thus overflowed, since the value of flowage rights is the difference between the value of the land with and without the servitude imposed by the flowage easement. The fact that under the taking by the government there would be only an intermittent flooding of some portions of the 1540 acres is immaterial, since the flowage rights of the company were rendered worthless by the government's taking and their value must be the basis of the company's compensation. To state the matter simply, the power company is entitled to compensation for its flowage right easement which is destroyed by the government's taking."

■ In the cases before me perpetual easements are taken, but the Government claims and says that the flooding will be but intermittent, leaving to the landowners whatever use may be made of the property, except for the servitude of the easement. As to the farm tract, that is, Tract No. J–846, the rule is to be applied in the same manner as Judge Parker indicated in his first decision, that is the measure of damages is the difference in value before and after the taking and not the entire fee value.

■ However, unlike the cases cited, as to the Pittsburgh seam of coal the property owners have been compelled by the State of Pennsylvania to cease all operations because of the danger of the water rising to the 975 foot level. As a result and under the testimony of all the witnesses in these cases, including the Government witnesses, the Pittsburgh seam of coal cannot be mined. The owners then are confronted with a condemnation of their coal which has a known market value. The easement is the right to flood the coal. It has no reference whatsoever to the land as to the first three tracts. Under the circumstances, the rule applied by Judge Parker in the second case, that is 218 F.2d 524, is the rule applicable in these cases. He held that the damages were to be measured by the fee simple value of the land which would be overflowed since the value of flowage rights is the difference between the value of the land with and without the servitude imposed by the flowage easement.

The concrete structure of the Conemaugh dam was completed on the 16th of October, 1951, at which time water in the reservoir could have been impounded up to an elevation of 948 feet (measured at sea level). However, the Government has supplied the information that the crest or top steel gates were assembled and in position so that the water could have been impounded to an elevation of 975 feet on the 6th of August, 1953. The plans for the construction of the Conemaugh dam and reservoir were of course on record with the Corps of Engineers. It is fair to infer from the evidence in this case and from other litigation that the Department of Mines of

the Commonwealth of Pennsylvania were concerned with the possibility of danger to miners employed in coal mines in the area by the impounding of water because of the flood control project. In these cases the evidence is that the inspectors of the Department of Mines, comprising the Eleventh Bituminous District of Pennsylvania, investigated mines which were then or would thereafter be affected by the waters of the Conemaugh River reservoir. As a result of the investigation, the plaintiff owners of the coal mine were notified on October 11, 1952 by Department of Mine investigators:

"1. No person shall go below elevation 950 in the Coal Hill mine [plaintiffs' mine] or in any mine which opens into it, except for inspection purposes only.

"2. When the top gates will have been installed on the Conemaugh River Reservoir, no person, except for inspection purposes only, shall go below elevation 975 in the Coal Hill mine or in any mine which opens into it."

That notice of October 11, 1952 was followed by an order of the Secretary of Mines of the Commonwealth dated October 17, 1952, the pertinent portion being:

"You will note that no persons shall be employed in the Coal Hill mine or in any mine which opens into it below elevation 950, and when the top gates have been installed on the Conemaugh River Reservoir, no persons shall be employed below elevation 975 in the Coal Hill mine or in any mine which opens into it."

Similar action was taken by the Department of Mines with regard to other mines in the same area. The Government has cited in its brief, Atlantic Crushed Coke Co. v. United States, 151 F.Supp. 317, 138 Ct.Cl. 505, where a somewhat similar notice was given a mine owner relative to the same reservoir.

The declarations of taking in these cases were filed January 11, 1955. This was apparently the final step in the acquisition by the Government of property necessary to the completion of the project. During the course of construction, however, the Department of Mines of the state was busy with reference to whether the impounding of the waters in the reservoir would affect operations in various mines. The installation of the top gates by the Government resulted in the exercise of the state's police powers, which in turn, as to the Pittsburgh seam of coal, has prevented any mining operations.

The position of the Government on this point, as the court understands it, is that it is not responsible for the state's police action and that in any event the state's action was and is not final with respect to the closing of the mine. It is understood that the Government makes the contention that some sort of warning system might be installed and thus the state might give permission to reopen plaintiffs' mine. It must be remembered that there has been an actual taking in these cases. The requirement that the property owner be awarded just compensation seems to this court to in turn require that the aqtualities as they existed at the time the Government installed the top gates and thereafter must be faced. History teaches that inadequate safety measures with respect to coal mines has resulted in tragic mine disasters. This court understands from counsel that none of the state's orders have been lifted or otherwise modified with regard to the prohibition of employees entering mines below the 975 foot level. On this phase of the case the Government has cited Atlantic Crushed Coke Co. v. U. S., supra. That was a Court of Claims decision. Plaintiff there asserted that the Government took its coal mining property by the installation of the same top gates on the Conemaugh River dam. The state had entered an order prohibiting the owner from mining below the 975 foot level after the installation of the gates.

But it is noticed in the case also that the state's order provided for some possible future modification in the event that an agreement satisfactory to the state could be reached between the Army engineers and the plaintiffs whereby the engineers would accept the responsibility of giving notice in sufficient time to provide for the safety of persons in and about plaintiffs' mine, etc. It is to be noticed also that the Court of Claims case did not involve an actual taking of property. Atlantic's mine was not to be flooded. The closing of plaintiffs' mine below the 975 foot level was because the coal barrier between another mine and plaintiffs' mine was not sufficient, in the opinion of the Department of Mines, to withstand the pressure of water which might arise if the water in the reservoir rose to the 975 foot level. The court stated the issue to be that, "Defendant cannot be said to have taken plaintiff's property, unless, as the natural and necessary consequence of the erection of this dam, plaintiff would be prevented from mining coal in its mine below the top elevation of the dam." 151 F.Supp. at page 319.

The Court of Claims decision presents but little assistance in deciding the problem in the instant cases. In the first place, plaintiffs had to prove their case by a fair preponderance of the evidence. The issue was decided upon whether or not there was a taking and under the evidence the court simply decided that there was no taking. The question of just compensation was not reached. In the instant case the issue is one of just compensation. The perpetual easement has been taken by the Government, that is, the right to flood the coal in the Pittsburgh seam. Under the Government's own evidence, that is the testimony of one of its chief witnesses, Laird Auchmuty, the taking amounts to the same thing as a total destruction of the value of the coal.

The Commission in its findings did not separately indicate as to what weight it put upon the closing of the mine by the State of Pennsylvania in fixing the award. It must be assumed, therefore, that the members of the Commission simply took this fact into account along with all the other evidence in arriving at their decision. Even though it has been mentioned that one of the two Government witnesses on value indicated that the flowage easement amounted to a total destruction or loss of the coal in the Pittsburgh seam and a fair reading of the testimony indicates that the other Government witness on value proceeded on the theory that there was a 50 percent destruction of the coal, it appears from all of the evidence that the Commission based its award on the difference in value before and after the taking, in accordance with the general rule in condemnation cases. The difference as to the amount of damages suffered by plaintiffs as testified to by the Government witnesses and the plaintiffs' witnesses is not so much in the value before and after the taking as in the value placed on the Pittsburgh seam before the taking.

The one Government witness, Mr. A. V. Eisaman, stated the value before the taking to be $15,000, and the other witness stated the value to be $7,000. After the condemnation, Mr. Eisaman's value was $7,500, and Mr. Auchmuty's was none, the result being that according to the Government's value witnesses, plaintiffs were damaged $7,500 according to Eisaman and $7,000 according to Auchmuty. But under the testimony, both witnesses indicated that a substantial reduction in value occurred as a result of the taking in these cases. For instance, had Mr. Eisaman placed a value of $50,000 on the coal beforehand, the resulting damage would have been $25,000 to the plaintiffs. And had Mr. Auchmuty placed a similar value on the coal prior to the taking, damages would have been $50,000. An examination of the evidence which was before the Commission leads this court to the conclusion that the awards made by the Commission find ample support in the evidence.

■ It seems to the court that the Government's contention that its witnesses were qualified and expert in the field and that the plaintiffs' witnesses were unqualified to place values upon the coal and surface land is without merit. The court has in mind that the members of the Commission saw and heard the witnesses. In a coal case particularly, it doesn't seem to this court that the Government's contention that the plaintiffs' witnesses were unqualified because lacking in professional training and lacking in professional degrees has weight. Plaintiffs' witnesses were men of long experience in the business. To say that they could not value the coal before and after because of being unable to make a thorough inspection of the mine itself is quibbling. The Pittsburgh seam of coal in Westmoreland County, Pennsylvania, according to the witnesses testifying in this case, is a well-known and well-defined strata of coal. Its quality is known, its thickness is known and was testified to in this case. The location and accessibility of the mine to the markets of the coal companies was brought out by plaintiffs' witnesses. The equipment in the mine was considered. Plaintiffs' witness, Glasgow, was a man of vast experience and knowledge. He had been Secretary of Mines of the Commonwealth of Pennsylvania for eight years. He had operated in mines in the area for many years for a large coal company. He knew coal values in the area. He had been in the coal mining business himself.

Plaintiffs' other expert witness, Tomajko, was likewise, in the opinion of this court from an examination of the evidence, a qualified witness. The weight of his testimony was for the Commission to evaluate in the first instance, as was that of Mr. Glasgow. It must be remembered also that the Commission heard the owners themselves as to the value of the coal in the Pittsburgh seam. The owners' testimony necessarily had to be given due weight and consideration by the members of the Commission.

■ The second of the Government's contentions, as previously mentioned, is that plaintiffs' witnesses used an erroneous measure to evaluate the coal in place. A number of decisions are cited by counsel for the Government with respect to this proposition. The point is made that as the condemnation related to mineral deposits, that is, the coal in place, plaintiffs' witnesses simply estimated the tons of coal which could be recovered and multiplied the number of tons by a certain royalty figure per ton in reaching their conclusions as to the value before the taking. The Government cites many of the authorities, all to the effect that in applying the valuation process to mineral deposits in place it has been held improper to determine the value thereof by using the product of the estimated amount of the deposit and the fixed price per unit. The Government cites Vol. 4, Nichols on Eminent Domain, Sec. 13.22, Kossler v. Pittsburgh, C., C. & St. L. R. Co., 208 Pa. 50, 57 A. 66, as well as Georgia Kaolin Co. v. United States, 5 Cir., 214 F.2d 284, United States v. 620.00 Acres of Land, etc., D.C., 101 F. Supp. 686, United States v. Land in Dry Bed of Rosamond Lake, Cal., D.C., 143 F.Supp. 314, and other cases. However, this court cannot conclude from the evidence in this record that the witnesses for the plaintiffs relied entirely upon the royalty method in fixing valuation. Certainly on cross-examination of these witnesses the royalty method of valuing the coal in place was discussed. It is noticed in this respect that what was said in the Georgia Kaolin Co. cases [214 F.2d 286]:

> "In eminent domain proceedings, the existence of valuable mineral deposits in the condemned land constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land. The reason for this rule is said to be that the measure of compensation in such cases is the market value of the land to be condemned, taken as a whole and with due consideration of all the components that

tend to make its market value. This rule has been applied to limestone deposits, gold ore, fire clay, coal, stone, and sand and gravel, 156 A. L.R. 1416–1417; but *there can be no recovery for both the value of the land and its mineral deposits as two separate items*. Atlanta Terra Cotta Co. v. Georgia Ry. & Electric Co., 132 Ga. 537, 64 S.E. 563; United States v. 620.00 Acres of Land, etc., D.C., 101 F.Supp. 686; Orgel on Valuation, under Eminent Domain, page 544, rejecting the method of estimating the amount of stone in situ and multiplying this amount by a fixed price per unit; also citing Searle v. Lackawanna & Bloomsburg Railroad Company, 33 Pa. 57. * * *" (Emphasis supplied.)

refers to mineral deposits in place in which the title to the mineral is in the same person as the fee title. The court goes on to say: "In rejecting the method of multiplying the estimated amount of clay by a fixed price per unit, the conclusion is largely based on its speculativeness." It is to be noticed, however, in the instant cases the only thing taken was the right to submerge periodically the mineral deposit, that is, the coal. It is undisputed that thirty acres of the Pittsburgh seam of coal remained in the mine in question. Further, one of the Government's two expert witnesses, Mr. Eisaman, testified as to the value of the coal per acre, but he conceded that in all his long experience in the business he had not only never purchased any Pittsburgh seam coal, but that all his dealings in coal had been based upon a certain price per ton rather than per acre.

Under all of the circumstances in these cases it seems to this court that it was proper for the royalty method of valuation to be considered by the Commission along with all of the other evidence. The exclusion of all such evidence in the present cases would be unrealistic. The quantity of coal was known, its quality and marketability were the subject of testimony. Certainly the Commission was entitled to give some weight to the royalty evidence in reaching the amount of just compensation. This court holds that under the facts before the Commission, the royalty evidence was admissible along with the other evidence in determining the damage suffered by plaintiffs.

It is understood that the Government's objections are applicable to the farm property, Tract No. J–846, also. Again it appears to the court that the Commission had ample evidence before it on which to base the award made to the plaintiffs, and therefore this award will not be disturbed.

The court has heretofore referred to Rule 53, which is applicable to these cases and which requires the court to accept the Commission's findings of fact unless clearly erroneous. From my examination of the evidence, I do not find the findings of fact clearly erroneous and therefore the conclusion of this court is that the findings of the Commission were permitted by the evidence which it had before it. The court has in mind that the commissioners had the opportunity to observe the witnesses while testifying, to appraise their credibility and to determine the weight to be given their testimony. The report of the Commission will in all respects be adopted.