**UNITED STATES of America,
Plaintiff,**

v.

**287.89 ACRES OF LAND, MORE OR LESS, Situate IN CLEARFIELD COUNTY, COMMONWEALTH OF PENNSYLVANIA, and Howes Leather Company, Inc., et al., Defendants.**

Civ. A. No. 62-395.

United States District Court
W. D. Pennsylvania.

Jan. 20, 1965.

Gustave Diamond, U. S. Atty., by Robert E. Tucker, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Thomas Welfer, Pittsburgh, Pa., for defendant, Harbison-Walker Refractories Co.

MARSH, District Judge.

On May 29, 1962, plaintiff filed its complaint to condemn, inter alia, the following tracts of land in which the title to the underlying clay was owned in fee simple by Harbison-Walker Refractories Company (Harbison), a defendant in this non-jury trial:

"(1) The fee simple title to Tract 503 containing 11.99 acres in Greenwood Township, Clearfield County, Pennsylvania; subject to existing easements for public roads and highways, public utilities, railroads and pipelines.

"(2) The fee simple title to Tract 504 containing 3.42 acres in the aforesaid township, county and state; subject to existing easements for public roads and highways, public utilities, railroads, and pipelines, reserving, however, to the owner or the owners of any interest therein, including third-party lessees, their heirs, executors, administrators and assigns, all clay and coal in and under said lands with full rights of ingress and egress for exploration, development, production and removal of said clay and coal which may be produced from said land; provided that the said clay and coal so reserved are subordinated to the prior right of the United States to flood and submerge the land as may be necessary in the construction, operation and maintenance of the project, and provided that any exploration or development of such rights shall be subject to Federal and State laws with respect to pollution of waters of the reservoir; provided further that the District Engineer, U. S. Army Engineer District, Baltimore, or his duly authorized representatives shall approve in furtherance of the exploration and/or development of such reserved interests, the type of and location(s) of any structure(s) and/or appurtenances thereto now existing or to be erected or constructed in connection with such exploration and/or development; said structures and/or appurtenances thereto shall not create floatable debris."

On the same day, the Declaration of Taking [1] was filed, and judgment of condemnation was entered requiring the owners to surrender possession immediately.

These tracts were required in connection with the construction and establishment of the Curwensville Reservoir Project in the West Branch of the Susquehanna River Basin.

The condemned Tracts 503 and 504 are portions of a larger tract containing

---

1. The Declaration of Taking discloses that the estimated compensation for Tract 503 was stated at $400.00, and for Tract 504 at $75.00.

52.53 acres.[2] The clay contained in the larger tract was conveyed in fee, along with other properties, to Harbison by deed (Ex. 1) [3] of North American Refractories Company in 1930. The consideration for all the properties described in the deed was over $500,000.00 (T., pp. 51–52). The portion of the price allocated to the clay in the 52.53-acre tract [4] is not known (T., pp. 51–52).

In addition to all the clay contained in the 52.53-acre tract, the following mining rights were conveyed to Harbison:

"[T]he right of ingress, egress and regress to explore for, dig, remove and carry away the same, with the right on the part of the Grantee to build necessary roads, railroads, airshafts, slopes or other structures as may be necessary in the course of proper mining to dig, remove and transport the said clay of said described property; with release on the part of the first party for damages to the surface or to the water thereupon or thereunder that may be caused by the mining and removal of said coal and other minerals in a proper manner.

"Together, also, with the right on the part of the Grantee to haul underneath the demised property, clay from other lands, free of charge, but this right shall not extend to any haulage or wheelage over the surface as above described except that from the drift mouth or drift mouths as they are constructed upon the demised premises, the Grantee shall have the right of way over the surface directly to the railway for the purpose of transporting said clay to the railway, this shall be confined to right of way from drifts as they may be necessary and opened for the removal of the minerals from the Watts land."

The evidence showed that the fee simple title to the 52.53-acre tract, except the clay and subject to the aforesaid mining rights, was vested in Vern I. Shuss.[4a]

Preston C. Mitchell, vice-president of Harbison in charge of mining, testified that the market value of the 52.53-acre tract on the date of condemnation and unaffected by it was $26,850.00; that the fair market value of said acreage after condemnation and as affected by it was the sum of $1,380.00; the difference of $25,470.00 being the total damage for the taking.[5]

William Yost, a registered mining engineer, called by the Government, was of the opinion that it was economically infeasible now or in the foreseeable future to remove the clay underlying the condemned tracts of land In 1958 and 1959, prior to the condemnation, this witness had been employed by the Corps of Engineers to make a study and report "of the valuation or the effect of taking of the minerals of the basin of the West Branch of the Susquehanna River by the Curwensville Reservoir and its effect on the economy of the area." (T., p. 113.) The study and report were not introduced into evidence.

R. T. Bromfield, a mining engineer and real estate broker, relying on the opinion

2. The parties agreed that Harbison is entitled to the difference in fair market value of the 52.53-acre tract (land and clay) before and after the taking (T., pp. 8, 29, 145–146). But see, United States v. 4.553 Acres of Land, etc., 208 F.Supp. 127 (N.D.Cal.1962).

3. All exhibits referred to are Harbison's except when otherwise indicated.

4. Item 9 in deed (Ex. 1).

4a. At a later trial in this civil action (United States v. Mary C. Watts), it appeared that Vern I. Shuss did not own Tract 504.

5. At T., p. 35, the witness said that as part of his evaluation he included the clay in Tract 504, which was reserved to Harbison. At T., p. 52, he admitted that the clay in Tract 504 had not been tested. At T., pp. 65–66, he indicated he knew nothing of the value of the clay in Tract 504 and did not include it in his evaluation.

of Mr. Yost, testified that the market value of the 52.53-acre tract prior to the taking was $5,612.50, and that the market value thereafter was $3,894.50. Of the $1,718.00 difference in value, he allocated $1,359.00 and $359 00 as the total damages for Tract 503 and Tract 504, respectively.

It was stipulated between the parties that the value of the condemned land in Tracts 503 and 504, excluding the clay, was $1,000.00 (T., pp. 156–158). Subtracting this amount from the aforesaid opinions of total damages for the condemned land and clay would leave as just compensation for the condemned clay alone $24,470.00 in Mr. Mitchell's opinion, and $718.00 in Mr. Bromfield's opinion.

Mr. Bromfield was also of the opinion that there was no severance damage (T., p. 143). Harbison disclaimed any severance damage (T., p. 76).

Neither witness was aware of any sales of clay land in Clearfield County since 1930. Mr. Mitchell participated in a sale of a developed clay vein in Fayette County in 1963. There unquestionably is a demand for flint and plastic clay for the manufacture of fire brick and house brick in the Clearfield area and elsewhere. However, it seems that the refractory companies for some time past instead of purchasing the clay veins have leased them at prices varying from 15 cents to 25 cents per ton (T., p. 72). It was not shown that the companies who mine the raw clay sell it in a competitive market; evidently they use it in their own refractory plants, as does Harbison.

The 52.53-acre tract is bounded on its southerly side by the West Branch of the Susquehanna River and is approximately two miles up the river from the village of Lumber City. Rights of way of the New York Central Railroad and a state highway traversed the land near the river and have been relocated (Exs. 2, 3). This tract is mainly mountaintop land with scrub oak, scrub pine and some good timber growing thereon.[6]

Tract 504 contains 3.42 acres, is bounded on the south by the West Branch of the Susquehanna River, and on the north by the old right-of-way of the railroad. The elevation of the river is 1185 feet above sea level[7] (T., p. 32). From the river's edge the land is level for about 100 feet and then rises abruptly and steeply to the old railroad right-of-way. The flint clay outcrops at the river's edge. The clay and mining rights in Tract 504 were reserved to Harbison. Although the quantity, quality, and extent of the clay in this tract were not established, the condemnation imposed restrictions upon the mining rights which would likely affect adversely the market value of the reserved clay.

Tract 503, containing 11.99 acres, lies to the north of Tract 504. It contains substantially all of the flint clay in the 52.53-acre tract suitable for manufacturing fire clay (T., p. 52; Ex. 2). Rising steeply from the old right-of-way of the railroad and the highway, it reaches elevations of over 1355 feet (Ex. 3).

At the time of condemnation there were two veins of clay in Tract 503. The softer, plastic clay, known as Kittanning clay, outcropped at or near the right-of-way of the old highway at an elevation in excess of 1250 feet above sea level. The depth of the Kittanning vein ranges from zero at outcrop to 250 feet throughout the 37 acres remaining of the 52.53-acre tract. This vein is approximately 7 feet thick and, prior to the taking, part of it could have been strip mined at outcrop and the remainder could have been deep mined (T., pp. 16, 43). The quality and quantity of the Kittanning clay in the remaining 37 acres were not established,

---

6. The Government witnesses were of the opinion that the highest and best use of the condemned tracts was as a tree farm and, in addition, as to Tract 504, a possible subdivision into lots for cabins along the riverfront (T., p. 132).

7. The project map attached to the Declaration of Taking (segment 5) shows the elevation to be 1190 feet.

probably because Harbison is not seeking severance damage (T., p. 76).

The flint clay vein under Tract 503 is about 80 feet deeper than the Kittanning vein and corresponds approximately to the low water mark of the river. This vein is not consistent and regular, but is found only in pots (T., pp. 52, 93). Flint clay is the more valuable of the two types of clay.[8] The bulk of the flint clay under the 52.53-acre tract is in Tract 503 (T., p. 52). Out of 11 test holes which were core drilled by Harbison's predecessor, only 3 disclosed flint clay under Tract 503 which is suitable for manufacturing refractories.

Drill hole 2 disclosed flint clay 2 feet 6 inches thick having a P.C.E. of 32–33.[9]

Drill hole 4 disclosed flint clay 7 feet thick having a P.C.E. of 32–34.

Drill hole 3 disclosed flint clay 1 foot thick having a P.C.E. of 33. However, the clay in the area within a radius of 100 feet from this hole (T., pp. 59–60) is too thin to profitably mine (T., pp. 40, 57; Ex. 2) and, therefore, should not be considered in determining just compensation.

Drill hole 5, just north of the boundary of Tract 503, discloses clay 4 feet thick, but the quality of the clay was not proved.

The average thickness of the flint clay suitable for mining, i. e., around drill holes 4 and 2, is 4 feet 9 inches thick.

Harbison is a large corporation having a plant in Clearfield and thirty plants at other places in the United States. It mines flint and plastic clay from which it manufactures refractories and building bricks. The plant in Clearfield used 80,000 to 90,000 tons of flint clay for the year 1963. At the time of taking, it was operating a deep mine about 8 miles from the condemned clay and extracting soft clay therefrom. Over the years Harbison has had competitors in the Clearfield County area and in other places, and it was found to be expedient in 1930 to purchase reserve clay lands for business purposes. Since 1930 up to the date of condemnation, Harbison was holding the clay under Tract 503 in reserve to be mined whenever business conditions of the refractory industry so required. There is no evidence that Harbison sold raw flint or plastic clay in a competitive market. Thus we find that the highest and best use for the flint and plastic clay underlying Tract 503 is to supply Harbison's plants in the reasonably foreseeable future for the manufacture of clay products.

We find that prior to the taking, it was economically feasible for Harbison to deep mine the clay in Tract 503 for use in Harbison's Clearfield plant and perhaps in other of its plants. Of course, there lurks an element of uncertainty in this finding because Mr. Mitchell was unable to estimate the expense necessary to open the mine or mines. We estimate the acreage of suitable flint clay under Tract 503 to be about 4 acres [10] (T., pp. 13, 14, 33, 49).

In our opinion the just compensation to which Harbison is entitled by reason of the condemnation is $8,500.00.

---

8. Mr. Mitchell testified (T., pp. 31, 73) that the value of the flint clay underlying Tract 503 amounted to $20,750.00, the value of the Kittanning clay amounted to $4,000.00, and the value of the land in the 52-acre tract amounted to $2100.-00. The testimony of Mr. Mitchell "in reference to market value of the surface as distinguished from the minerals" was stricken from the record (T., p. 108).

9. P.C.E. is the abbreviation from pyrometric cone equivalent by which the quality of flint clay is measured. Fint

clay having a P.C.E. less than 32½ is worthless for manufacturing fire brick for blast furnaces (T., pp. 37, 38)

10. Mr. Mitchell estimated the suitable flint clay under Tract 503 at 7½ acres (T., p. 59; see crosshatched area Ex. 3). We do not think his estimate is justified, however, because it seems to include clay 4 feet thick around drill hole 5, the quality of which was not shown, and the area outside the northern boundary of Tract 503.

*Competency of Witnesses.*

Each party objected to the testimony of the opposing expert on value.

Mr. Mitchell, Harbison's expert, was born in Clearfield and since his younger days has had close contacts with the area. He is Harbison's vice-president and as such has been in charge of mining for 8 or 9 years. He is also a director and stockholder of the company. Prior to attaining his present position, he was general mine superintendent. Of his 42 years in Harbison's employ, 40 years have been spent in the mining department. His duties, among others, have been to provide Harbison with the raw clay for manufacturing refractories and bricks, and in doing so, he supervised the leasing, optioning, and procurement of clay properties, as well as the drilling, prospecting, mining and testing associated with its production. In a 10-year period through 1963, his department obtained 1785 mining leases, leased 107 company properties, purchased 207 properties, conveyed 206 properties, obtained 31 rights-of-way, and granted 107 rights-of-way. Mr. Mitchell knew the condemned land and testified that he knew its value.

On October 11, 1963, *after a year and a half of negotiations,* Harbison sold developed clay land in Fayette County, Pennsylvania, approximately 100 to 120 miles distant from Clearfield. This after-condemnation sale of similar flint and plastic clay was the result of lengthy negotiations and was uninfluenced by the condemnations for the Curwensville Reservoir. It was not too remote in distance,[11] or in time,[12] and is entitled to consideration.

However, we think the Fayette sale can be accorded but little weight. The Fayette clay was classified as "deep mine" and sold for approximately $3,585.00 per acre, which was only $322.00 an acre more than Harbison's claim of compensation for the condemned clay.[13] Mr. Mitchell, who participated in the Fayette sale on behalf of Harbison, agreed that the Fayette and Clearfield properties were "dissimilar" (T., p. 82), and it is obvious that the value of a developed body of "deep mine" clay (T., p. 80) which was "strippable" (T., p. 82) would be much greater than the value of clay in the condemned tract where a deep mine would have to be opened. This is especially so in this day of high labor costs, and, as stated, the witness was unable to estimate the costs of developing Tract 503.

Undoubtedly Mr. Mitchell possessed the means to form intelligent opinions derived from his specal knowledge of the nature and kind of clay land in controversy, and its value; he had and utilized means superior to those available to the fact finder.

Thus, we think this witness, as an officer of Harbison, although not a licensed mining engineer nor a licensed real estate appraiser, was competent to testify as to the value of land in Clearfield County containing flint and Kittanning clay deposits, because of his vast experience and expertise acquired from personal experience with this kind of property.[14] His testimony is entitled to consideration,

11. United States v. 84.4 Acres of Land, etc., 224 F.Supp. 1017 (W.D.Pa.1963).

12. Virgin Islands Housing Auth. v. 15.-5521 U.S. Acres of Land, 230 F.Supp. 845 (D.C.V.I.1964) and cases cited therein.

13. Harbison ultimately claimed $24,470.00 for the condemned clay alone, i. e., $24,470 ÷ 7½A. = $3,263.00 per A.

14. Travelers Indemnity Co. v. Plymouth Box & Panel Co., 99 F.2d 218, 223 (4th Cir. 1938); In re Re-Bo Mfg. Co., 90 F.Supp. 388, 390 (S.D.N.Y.1950); Westinghouse Air Brake Co. v. City of Pittsburgh, 316 Pa. 372, 377–378, 176 A. 13, 15–16; 32 C.J.S. Evidence § 546(116), p. 435; 20 Am.Jur., Evidence, § 893; Jones on Evidence (5th ed.), vol. 2, § 408, p. 766. Cf. Pennsylvania "Eminent Domain Code", 1964, Special Sess., June 22, P.L. 84, No. 6, Art. VII, § 704, 26 Purdon's Pa.Stat.Ann. § 1–704.

but in all the circumstances, its weight is quite limited.[15]

Mr. Bromfield was a licensed real estate broker who was engaged in business in Clearfield and, since 1957, had been doing appraisal work exclusively. He, too, knew the condemned land and testified as to its value. His estimates of market value before and after condemnation were based upon the opinion of Mr. Yost that mining the clay in Tract 503 was economically infeasible because of high labor costs necessarily to be incurred in opening the mine, and upon two alleged comparable sales of mountain land in the vicinity, neither of which was known to contain veins of flint or plastic clay.[16] We accord little weight to the opinions of Mr. Bromfield because we find that mining the clay in the condemned tract was economically feasible to supply Harbison's probable future needs for clay, and thus the two sales are hardly comparable. However, we think both Mr. Yost and Mr. Bromfield were competent witnesses and their testimony is entitled to consideration.

*Valuation of Condemned Clay Deposits*

No one knew of any sales of clay land in the Clearfield area. The absence of comparable mineral sales in the vicinity presents a difficult problem, but the existence of fire and plastic clay deposits cannot be ignored since they may be of value and a proper factor to be considered in arriving at the just compensation to which the owner is entitled. 4 Nichols, Eminent Domain, 4th ed., § 13.22.

 The law seems well settled that opinions of witnesses as to value of minerals in place need not be based on sales

of the same or similar mineral deposits. Cf. Montana Railway Co. v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681; United States v. Silver Queen Mining Company, 285 F.2d 506 (10th Cir. 1960); III Wigmore, Evidence, 3d ed., §§ 714(3), 714(4). As stated in Montana Railway Co. v. Warren, supra, 137 U.S. at page 352, 11 S.Ct. at page 97:

> "It may be conceded that there is some element of uncertainty in this testimony, but it is the best of which, in the nature of things, the case was susceptible."

Also, in United States v. Miller, 317 U. S. 369 at p. 374, 63 S.Ct. 276 at p. 280, 87 L.Ed. 336, it is stated:

> "Where, for any reason, property has no market *resort must be had to other data to ascertain its value;* and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons." (Emphasis supplied.)

Cf. Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765.

 Although at the time of taking there was no open mine on Tract 503 and, it is possible, there never would be,

---

15. Mr. Mitchell also indicated that he had arrived at the amount of compensation for clay underlying Tract 503 by multiplying estimated clay tonnage by a unit price per ton. No credence can be given to this testimony because there is no competent evidence of the number of tons of plastic and flint clay in Tract 503. The Government's objection in this regard is sustained, and the tonnage estimates are stricken (T., pp. 53, 54, 99–100).

16. The average selling price of the alleged comparable sales was about $77.00 per acre. In estimating the market value of Tract 503, Mr. Bromfield seems to have adjusted this price upwards by $36.-00 per acre, arriving at a market value of $1,359.00, possibly to compensate Harbison for the underlying clay which Mr. Yost believed could not be economically mined.

nonetheless the adaptability to the purpose of mining flint and plastic clay gave these mineral deposits a present value in the market, and Harbison is entitled to that value, even though the prospect of actual mining was at some indefinite time in the future. The owner is entitled to the present market value of its condemned clay for the best use to which it is adapted. The availability of the clay veins for valuable use, and not their present employment, seems to be the criterion from which their value is to be determined.

Harbison purchased these minerals as a reserve stock. At the time of taking the possibility that it would have in the future mined the clay for use in its Clearfield plant is not so remote, speculative and improbable to require the court to disregard the evidence of its value. The refractory industry in the Clearfield area indicates an existing as well as an expected continuing future demand for plastic and flint clay for the manufacture of clay products. Although the quality of the evidence requires considerable speculation and conjecture, the fact finder is nonetheless obligated to reach a standard of value dictated by the nature of the case. "In this estimation the owner is entitled to have consideration given" to the capabilities of the clay and the present and expected future demand therefor, "and to any and every use to which it may reasonably be adapted or applied. And this rule includes the adaptation and value of the property for any legitimate purpose or business, even though it has never been so used, and even though the owner has no present intention to devote it to such use." 4 Nichols, Eminent Domain, 4th ed., §

12.2[3], pp. 61–62; Boom Company v. Patterson, 98 U.S. 403, 25 L.Ed. 206.

*The Finding of Just Compensation.*

It is well known that a witness estimating just compensation in eminent domain cases will usually reflect his optimism or pessimism, as well as his interest in the party for whom he testifies. No matter how honest the expert may be, he cannot ignore the fact that the expert on the other side will be prejudiced. He, therefore, increases or decreases the amounts in his testimony to offset the other side's figures. Thus, the opinion of each expert must be subjected to careful and critical scrutiny.

We think Mr. Mitchell and Mr. Bromfield were informed persons, but in all the circumstances, in our opinion, Mr. Mitchell's estimate of value is exaggerated, but on the other hand, Mr. Bromfield's estimate is minimized. The court is not required to accept the value opinions of the witness for either side, but may find just compensation to be within the range of values placed thereon by those witnesses.[17]

In determining the elusive market value of the clay deposits at the time of taking, we have regard for the existing demands of the refractory industry in the Clearfield vicinity and believe those same demands reasonably may be expected to continue into the future.

In accordance with our best judgment and in the light of the evidence and principles herein set forth, we have found $8,500.00 to be the just compensation to which Harbison is entitled.

This opinion is intended to serve as findings of fact and conclusions of law as required by Rule 52, 28 U.S.C.

17. See: The Conqueror, 166 U.S. 110, 131–133, 17 S.Ct. 510, 41 L.Ed. 937; Onego Corporation v. United States, 295 F.2d 461 (10th Cir. 1961); Seale v. United States, 243 F.2d 145 (5th Cir. 1957); United States v. 206.82 Acres of Land, etc., 205 F.Supp. 91 (M.D. Pa.1962).