STATE of Missouri ex rel. STATE HIGHWAY COMMISSION of Missouri, Appellant,

v.

Julia F. FOELLER et al., On Exceptions of Wellsville Firebrick Company, a corporation, and New Florence Firebrick Company, a corporation, Respondents.

No. 51228.

Supreme Court of Missouri, Division No. 2.

Dec. 13, 1965.

Robert L. Hyder, Thomas E. Cheatham, Jefferson City, for appellant.

Walter D McQuie, Jr., Montgomery City, William J. Kenney, Kenney, Stevens, Hill & Clark, Pittsburgh, for respondents.

PRITCHARD, Commissioner.

In this condemnation case of a portion of land for the right of way for Interstate Highway 70 in Montgomery County, Missouri, respondents recovered judgment for $82,000 for the taking of 100,000 tons of their subsurface mineral rights to New Florence Flint clay. The clay, described as high quality, is used in the manufacture

of superduty fire brick. Appellant contends that the judgment is excessive as a matter of law by $52,000. We thus have jurisdiction of the appeal.

By Point II, appellant insists that the trial court erred in overruling its timely motion to strike the opinion testimony of market value of respondents' witnesses Weiss, McCarthy and Arthur on the ground that their opinions were not based upon proper elements of damage and had no correlation with the established market value of the undeveloped mineral property. Before we review the testimony of these witnesses we set out other background facts.

Although respondent New Florence Firebrick Company (herein called "New Florence") once engaged in the manufacture of bricks, it now merely holds as its chief assets clay reserves which it leases exclusively to its sister corporation, respondent Wellsville Firebrick Company (herein called "Wellsville"). On May 1, 1922, New Florence acquired title from one Gilbert (its officer) to fire clay and flint rock deposits, and an easement for the mining thereof, to what was known as the Kobush 80 in Montgomery County, Missouri. This rectangular tract, lying north and south, formerly adjoined old U. S. Highway 40 which is now the north outer road to newly constructed Interstate 70. In the northwest corner of the tract are the clay deposits, the value of which is in controversy. They underly 3.18 acres, the total area taken, and an area to its south. It is not disputed here by appellant that there exists and was taken (actually and by rendering it unminable because of the necessity for subjacent support to the right of way) 100,000 tons of "New Florence Flint" fire clay which is usable in respondents' business.

On April 2, 1962, New Florence leased to Wellsville said mineral rights, and such lease was subsequently extended, the last term of which extended beyond the date of taking, September 6, 1963. The consideration for the lease was that Wellsville should pay New Florence 30¢ per ton for the fire clay removed thereunder. Wellsville, located 7 or 8 miles north of New Florence, is a refractories plant which produces about 100 different refractories products for the steel, metallurgic, glass and other types of heavy industry. The clay deposit in question lies about 3 miles south of New Florence, and has an overburden of sand, rocks, coal and dirt averaging 50 feet in depth. The procedure for mining clay, 20,000 tons of which are used by Wellsville each year, is first to remove the overburden by stripping down to the clay. The specific selections of clay are segregated at the pit into various types and qualities. It is not stockpiled, but is mined in small quantities, then hauled to Wellsville where it is ground and combined into what tests show are the proper percentages of materials, and then it is made directly into brick.

Mr. Russell Weiss testified that he is Vice President in charge of operations for Wellsville, and is Assistant Treasurer of New Florence. He has been employed for 30 years in the refractories business. Among others, one of his duties has been concerned with all acquisitions of clays. Clay mining is done generally within a 30-mile area in, around and about Wellsville, with a larger proportion mined in Montgomery County. New Florence Flint clay is a true flint clay with very low impurities and a relatively high melting point; it has plasticity—the ability to be formed of itself without the addition of other more or less impure types of clay; it is used for superduty and high fired superduty refractories products. It is found mostly in an area centered on the town of New Florence, and within an area of 5 or 6 miles to its south, with some little bit to the north of the town. The clay deposit is a reserve which has been procured, drilled and proved as to quantity and quality, and which is awaiting mining at the earliest date upon which the type of clay is required, and which could not be obtained elsewhere. Wellsville has reserves because experience has indicated that it is becoming increasing-

ly difficult to find high quality clays such as is in the deposit.

Concerning initial acquisitions of clay deposits, and arrangements with land-owners therefor, Mr. Weiss testified that at the time exploratory drilling is started, a lease is made, or a stipulation as to payment, for the right to go upon, mine and remove any clay found. For New Florence Flint clay the price, depending on the location, number of feet of overburden and other factors, will normally be in and around 30¢ per ton. The lease-contract agreement is entered into usually before any knowledge is available as to quality or quantity of the clay. Testing of the Kobush 80 began in 1958 and was completed early in 1962.

Mr. Weiss testified that as a part of his duties as Vice President of Wellsville he takes part, and has for 20 years, in the acquisition of minerals and mining rights and the negotiating of leases and instruments called warranty deeds for fire clay, being directly concerned therewith. He has discussed the question of acquisition of mining rights with persons in other refractories plants, and thought that, based on his own job duties and contact with persons in other plants, he had an idea of the value of fire clay, mining rights and minerals. He was then permitted to testify that in his opinion the fair and reasonable market value of the minerals and mining rights in and under the Kobush 80 immediately prior to the taking was about $300,000, and after the taking the value was $6,000 for 2,000 tons of clay remaining. He was then asked what factors he took into account in arriving at his valuation before the taking of the property. He answered that there were a great number of factors in addition to the 30¢ per ton which would have to be paid for royalties. The first mentioned was the location of the property—the proximity of the deposit to plants, in this case it being almost centrally located from almost all of the refractories companies located in east central Missouri. The second was the very important factor of scarcity

of the type of clay—"[E]ach year it assumes a greater and greater importance. The difficulty of finding a pit of this size is very much greater in 1963 than it would have been five years previous." The third factor was the quality of the clay, in this case excellent. "Any of the refractories plants in East Central Missouri would consider this to be an attractive pit and valuable mining property." The fourth factor was the overburden on the clay deposit, in this case around 50 feet. This would be somewhere around 300,000 tons as against a recovery of clay of 100,000 tons, a 3 to 1 ratio. The instant property contains less overburden than some properties presently being mined. The fifth factor entering into the matter of the market value of the clay was testified by Mr. Weiss to be the costs of finding new clay.

On cross-examination Mr. Weiss was referred to answers to interrogatories made by him in which he had listed the sales, leases or transactions he believed to have any value in determining the fair market value of the condemned pit. He was asked if he considered any sales or acquisitions in arriving at his valuation aside from those listed on the interrogatory answer, to which he answered "I would say no, no other sales or acquisitions." The interrogatory answer showed that Wellsville had four properties leased "of 25 cents, 25 cents, 10 cents and 25 cents and 15 cents and 30 cents per ton, is what you pay for it, isn't it?" Mr. Weiss answered, "Those are the royalty payments, yes." He testified further that he based his opinion on a great variety of factors, and prefaced those by saying "In addition to the royalty payments." In acquiring mining rights from farmers he considered the proximity factor and the overburden, but not the scarcity and quality of the clay, 25¢ and 30¢ is considered to be a relatively standard and fair royalty payment. For 100,000 tons of clay $30,000 would be all the landowner would ever get.

Robert J. McCarthy is Executive Vice President of respondent companies. He had been continuously employed in the fire-

brick business since 1939, going with respondents in 1960. He was familiar with the Kobush 80 and the fire clay pit in the northwest corner thereof, and had seen all the maps and drill records on the property. Harbison-Walker Company was mining similar clay on property adjacent to the Kobush 80 and all companies were prospecting and mining in the area where the New Florence clay is found. 30¢ a ton royalty is the sum that is set forth in the lease arrangement between New Florence and Wellsville. Royalty payments to landowners are usually, and in respondents' case always, arranged prior to any drilling or testing. The figure of 30¢ per ton is the current accepted royalty in the refractories industries in the area for this particular kind of clay under these particular conditions. The 30¢ royalty relates to economic value. It is the first step of a long series of things which happen to determine value. He testified further that he was acquainted with the reasonable market values of minerals in place, under the ground, known as New Florence clay and the mining rights attendant to those minerals in place. The cost of finding clay, related to the number of tons discovered, would be in excess of $1.00 per ton. He gave his opinion that the value before the taking of the minerals was $306,000, afterward $6,000. The factors considered by him were: The 30¢ per ton royalty paid; the total quantity of clay; the kind or quality of the clay, and that pits of this size are almost unheard of in the New Florence area which is the only place this kind of clay is found; the proximity of the clay deposit to other refractories plants in the area (because "the farther away you have to go to get it, the more its going to cost you to haul it back to your plant"); the cost of finding clay.

On cross-examination McCarthy testified that his opinion was not based in any way on any sales or acquisitions of any kind of New Florence flint other than the 30¢ royalty figure. He did not personally know of any other transactions or sales of New

Florence flint, by deed, other than the straight royalty arrangements.

J. B. Arthur, a consultant to Kaiser Refractories at Mexico, Missouri, testified that flint clays in the New Florence vicinity are now very scarce—they are getting pretty well worked out and used up. "There are still reserve deposits owned by all of the larger companies which have not been mined." He gave his opinion that the market value of the clay deposit was $135,000 before the taking and nothing thereafter. He testified that he knew what the clay was worth delivered at plants in the district, and what they were paying for it; the quantity and quality of the clay; the overburden; its location from Mexico, Vandalia, Farber, Wellsville and Fulton, where the firebrick plants are located; what the rates are for hauling the clay there; what the going rates are for mining the clay—taking the burden off and hauling the clay in. He testified further that "I know just about exactly what they are paying for flint clays delivered in these plants and putting those altogether, I considered the worth of it there, that is in proportion to all of those things added together."

Under the argument of Point II, appellant says that loss of business or future profits is not compensable. It cites Accomac Realty Co. v. City of St. Louis, 347 Mo. 1224, 152 S.W.2d 100; St. Louis Housing Authority v. Bainter, Mo., 297 S.W.2d 529; Tate v. State Highway Commission, 226 Mo.App. 1216, 49 S.W.2d 282. These cases do set forth that very general rule, but we are unable to ascertain, and appellant nowhere points out, how they are applicable to the case at bar. In our reading of the record, and in the briefs of the parties, we do not find any allusion or reference in the testimony of any witness that the damages for taking was based upon respondents' loss of profits. Appellant says, "Further, the increased cost of doing business caused by condemnation is not a recoverable item of damages." We find nothing in the record that the increased cost of doing business was a factor taken into ac-

count by witnesses unless it could be said that the cost of *finding* clay deposits, as testified to by two witnesses, was improperly used as a factor. Appellant does not specifically so state. Certainly there was testimony that there is considerable expense connected with locating, testing and evaluating clay deposit, and such expense would be a factor in determining the market value of the instant clay deposit. Appellant's cited cases, State ex rel. State Highway Commission v. Cox, 336 Mo. 271, 77 S.W.2d 116, and State ex rel. Kansas City Power and Light Company v. Salmark Home Builders, Inc., Mo., 375 S.W.2d 92, have no such issue.

Although appellant's third argument in its brief relates to the well-established rule that market value is not the value to the condemnee but the price the property would bring if offered for sale on the market, it ties that rule to no testimony in the case. All three of respondents' witnesses testified that the damages they assessed related to market value. None testified that such damages related to the value of the clay property to condemnees.

■ The parties join in an issue in their briefs on the general rule (see Union Electric Company v. Jones, Mo., 356 S.W. 2d 857; Missouri Edison Company v. Gamm, Mo.App., 379 S.W.2d 166) that "Mineral deposits are not to be valued separately but only as they enhance the value of the land." Such is the rule where there is no severance into separate estates of surface and mineral rights. Where there is a mineral deed, the subsurface rights conveyed create a separate, distinct interest apart from the surface rights. See Gordon v. Million, 248 Mo. 155, 154 S.W. 99, 101 [1]; Young v. Young et al., 307 Mo. 218, 270 S.W. 653, 654 [1], 39 A.L.R. 734; Groves v. Terrace Mining Company, Mo., 340 S.W.2d 708, 710 [3, 4]; 4 Nichols, Eminent Domain, 3rd Ed., § 13.22 [1], p. 422. Appellant admits in its brief that respondents have a property interest for which compensation is due in addition to the surface

interest previously obtained from another party. In the trial court both parties treated the condemned mineral rights to the clay as an estate separate from the surface, and the issue was the value of the clay in place.

■ One real and meritorious question in this case is whether the fact that two of the witnesses, Weiss and McCarthy, did not base their opinions upon evidence of any sales of New Florence flint clay on a market, but gave other factors as a basis for such opinions, renders their testimony inadmissible upon appellant's timely objection thereto.

The evidence establishes that the instant mineral deposits consist of rare, high quality New Florence flint clay. Companies in east central Missouri engaged in the refractories business are in competition for clay deposits of this type. Consequently, once the mining rights and easements therefor are acquired, the companies do not sell them, but hold them in reserve for future use in the production of the heat resistant fire bricks for various industries requiring them. There can be no question but that there is an existing demand for this type of fire brick clay in the area of all the refractories plants. Wellsville itself uses 20,000 tons per year of New Florence flint clay. The highest and best use of the clay for superduty fire brick is established by the evidence, as is also the fact that proved clay deposits such as this have not been bought and sold in place upon the market. It is not disputed that the amount of usable clay is 100,000 tons and that it has some value to respondents for which they are entitled to compensation.

In United States v. 287.89 Acres of Land, Etc. (U.S.D.C.Pa.), 241 F.Supp. 456, there was involved the condemnation of reserve stock clay deposits for which there had been no sales in the vicinity. The court there said, loc. cit. 241 F.Supp. 462 [1, 2], "The law seems well settled that opinions of witnesses as to value of minerals in place need not be based on sales of the same or similar mineral deposits." The court quoted from United States v. Miller, 317 U.S. 369, 374,

63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55 (loc. cit. 241 F.Supp. 462), " 'Where, for any reason, property has no market *resort must be had to other data to ascertain its value*; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons.' " This case is in point with the case at bar, and we approve the statement of the court (loc. cit. 241 F.Supp. 463), "Although the quality of the evidence requires considerable speculation and conjecture, the fact finder is nonetheless obligated to reach a standard of value dictated by the nature of the case. 'In this estimation the owner is entitled to have consideration given' to the capabilities of the clay and the present and expected future demand therefor, 'and to any and every use to which it may reasonably be adapted or applied. And this rule includes the adaptation and value of the property for any legitimate purpose or business, even though it has never been so used, and even though the owner has no present intention to devote it to such use.' 4 Nichols, Eminent Domain, 4th ed., § 12.2 [3], pp. 61–62; Boom Company v. Patterson, 98 U.S. 403, 25 L.Ed. 206." See also Phillips v. United States (9th Cir.), 243 F.2d 1; United States v. Silver Queen Mining Company (10th Cir.), 285 F.2d 506.

The factors given by all witnesses, Weiss, McCarthy and Arthur: the proximity to refractories plants, the scarcity of the clay, its quality and use of mining, the costs of finding it, and the original cost of the royalty to the landowner, are all matters which a willing seller would urge upon and bargain with a willing buyer if the sale thereof were contemplated. Certainly the jury could find, based upon these reasonable factors, that there exists a market value for the clay over and above the initial royalty payments. Witness Arthur stated additionally that he knew what the clay was worth delivered at the plants in the district, the quantity and quality of the clay, its overburden, its location from plants, hauling rates, and taking the overburden off and hauling the clay. The reasonable construction which the jury could place upon his testimony is that the clay was worth $135,000 *in place* (the value at the plants, less hauling and mining expense, resulting in the value at the mine), and not its value at refractories plants after mining and hauling expense. All of these witnesses testified to their knowledge of acquisition of clay deposits, the customs of the refractories industries in holding and using the clay, that they knew of the instant deposits, and that in their opinions it had value, to which they were permitted to testify. As was said in Montana Railway Company v. Warren et al., 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681, "It is difficult to lay down any exact rule in respect to the amount of knowledge a witness must possess, and the determination of this matter rests largely in the discretion of the trial judge. (Citing cases) The witnesses whose testimony is complained of all testified that they knew the land and its surroundings, and many of them that they had dealt in mining claims situated in the district, and had opinions as to the value of the property. It is true some of them did not claim to be familiar with sales of other property in the immediate vicinity, and the want of that means of knowledge is the specific objection made in the supreme court of the territory to the competency of those witnesses. But the possession of that means of knowledge is not essential. It has often been held that farmers living in the vicinity of a farm whose value is in question, may testify as to its value, although no sales have been made to their knowledge of that or similar property. Indeed, if the rule were as stringent as contended, no value could be established in a community until there had been sales of the property in question, or similar property." The trial court did not err in refusing

to strike the opinion testimony of these three witnesses, and appellant's Point II is overruled.

By Point III appellant contends that the trial court erred in giving Instructions Nos. 1, 2 and 3 for respondents and refusing appellant's Instructions Nos. 8, 9 and 10, for the reason that respondent's given instructions authorized the jury to value mineral deposits separately and did not limit the value to the amount the deposits enhance the value of the land.

Instruction No. 1 told the jury that appellant had taken the fire clay and mining rights of respondents under 3.18 acres of land and a drainage easement under .18 acres of land under which respondents owned the fire clay and mining rights, and that the verdict must be for respondents, and that in assessing just compensation the jury should consider all the evidence under the instructions of the court. The instruction then told the jury that such just compensation is the difference in the fair market value of the fire clay and mining rights immediately before and immediately after the appropriation.

Instruction No. 2 told the jury that it might take into consideration the value of the fire clay and mining rights actually appropriated, and the damages to the remainder of such rights by reason of the appropriation and construction of the highway.

Instruction No. 3 told the jury that the term "fair market value" meant the actual value of the fire clay and mining rights in and under the tract of land, that is, "the price which such fire clay and mining rights would bring when offered for sale by one willing but not obligated to sell them, and is bought by one willing or desirous to purchase them but is not compelled to do so." This instruction went on to tell the jury that the fire market value did not mean a forced sale, but what respondents, wanting to sell, could have obtained upon the market from parties who wanted to buy on September 6, 1963, and would give them the full value for the highest and best use of such fire clay and mining rights.

Refused Instruction No. 8 told the jury that the damage to respondents was the difference in the fair, reasonable market value of the whole of respondents' property on the date of appropriation and the fair, reasonable market value of the remaining portions of the property in its then condition. This is essentially the same definition as is set out in Instruction No. 1, but with the word "property" substituted for the words "fire clay and mining rights."

Refused Instruction No. 9 told the jury that the sole property rights appropriated were the ownership and easement for mining and removal of fire clay, and that the fair, reasonable market value of respondents' property rights in the land was the fair reasonable market value which the fire clay and flint rocks and appurtenant easements added to the market value of the land.

Refused Instruction No. 10 defined "fair market value" essentially the same as Instruction No. 3, substituting the word "property" for the words "fire clay and mineral rights."

■ We hold that the trial court did not err in the giving of said instructions and in the refusal of appellant's requested instructions. As stated above, the *sole* interest of respondents was the fire clay deposit and the right to mine it. It was a separate estate from the surface right, the interest in which had been previously acquired by appellant separately. In 293.080 Acres of Land, Etc. v. United States (W.D.Pa.), 169 F.Supp. 305, 311, the court quoted from the Georgia Kaolin Co. v. United States cases [5 Cir., 214 F.2d 284, 286] that " 'there can be no recovery for both the value of the land and its mineral deposits as two separate items,' " and then stated that the rule "refers to mineral deposits in place in which the title to the mineral is in the same person as the fee title." See again the exception to the general rule where the mineral deposit is itself subject to condemnation, 4

Nichols, Eminent Domain, 3rd Ed., § 13.22 [1], p. 422. We find no reference in the instructions authorizing the valuation of the in-place minerals based on the price they would bring after mining and exploitation as argued. In this "separate estate" situation, it would have been improper to limit the value of the clay deposits to that amount their value would add to the value of the bare land, as submitted in appellant's refused Instruction No. 9. Point III is overruled.

Appellant says that the verdict is excessive and is not supported by the evidence, and that all the competent, admissible evidence shows that the respondents are entitled to a maximum of $30,000. The argument developed under this Point IV is tied to the amount which respondents' witnesses testified was paid by it and competing refractories companies in the acquisition of clay mining rights, 30¢ per ton. Appellant argues: (1) "Is it not fair for the clay companies to sell through condemnation for the same price they themselves have set as the maximum market value they would pay for a warranty deed for the identical interests?"; and (2) "While there may be a subjective value in excess of 30¢, while there may be opportunities to produce profit over 30¢, while there may be income lost and business incentive flustrated, this is the maximum market value and this amount only reached when 'four or five or six firebrick manufacturers are bidding against each other for the right to go in and mine.' This is the market place, the established market value. This is what the citizens of Missouri receive for undeveloped New Florence clay under conditions most advantageous to them."

■ We have already ruled that the testimony of witnesses Weiss, McCarthy and Arthur was competent. The question is whether respondents are bound by their own evidence of the amounts paid landowners for the right to go upon land and remove the clay. We rule against appellant on this point. Although the going, usual price paid landowners for initial mining rights is some evidence of value if not too remote, it is not conclusive. City of St. Louis v. Turner, 331 Mo. 834, 55 S.W.2d 942, 945 [3]; State ex rel. State Highway Commission v. Henderson, Mo.App., 381 S.W.2d 10, 11 [1, 2]. The jury here could reject that evidence, and respondents are not bound by the evidence as to what is generally paid landowners for the right to mine fire brick clay. Especially is this true in view of the witnesses' testimony that a lease-contract is entered into before any knowledge is available as to quality or quantity of the clay; that the amounts paid were royalty payments; "the 30¢ royalty relates to economic value. It is the first step in a long series of things which happen to determine value"; that the 30¢ a ton royalty does not have any effect on what the clay is worth (witness, Arthur). Each witness testified that the royalty payment was a factor considered as bearing on market value. This initial payment for mining rights does not bind respondents thereto, but they were entitled to show, as they did, other factors bearing upon the market value of the clay for its highest and best use: superduty fire brick. The jury was thus entitled to consider also the location and size of the pit, proximity to refractories plants, scarcity, overburden, and cost of finding and proving clay deposits.

■ The last point we consider is appellant's Point I, in which it contends that the trial court erred in sustaining respondents' objections to Interrogatories 4, 5, 6, 7 and 8, which objections were filed more than 10 days after service thereof. We attach no importance to the delay in objecting for more than 10 days as provided by Civil Rule 56.01, V.A.M.R. inasmuch as appellant did not itself comply with Civil Rule 61.01 by moving for an order compelling answers. The matter was ruled by the trial court and the question is whether appellant was entitled to have the interrogatories answered, and if so, was the trial court's failure to require answers prejudicial to appellant?

Interrogatories objected to were as follows: "(4) Give the County, Township, Range, Section, and Quarter-Quarter section of each property where Wellsville, New Florence, or Chicago companies own mineral rights and the consideration paid for their rights. (5) Give the above information on all parcels in which the above companies have any mineral leases. (6) List the drillings or tests and dates conducted on those parcels listed in questions numbered 4 and 5, and the approximate quality and quantity of clay in each. (7) Indicate which of the above pits are presently being mined. (8) List all the acquisition of fire clay by outright purchase, advance royalty agreement or lease of Wellsville, New Florence or Chicago companies, including the following information: (a) Type of acquisition, purchase, lease, advance royalties, etc. (b) Price. (c) Approximate amount of clay in tons. (d) Type of clay. (e) If any option was given in advance, the date of said option. (f) Date and type test made. (g) Result of test; type clay; approximate tons. (h) Date of acquisition. (i) Consideration paid."

▪ The relevant inquiry, for which appellant *did* obtain answers, related to the acquisition and mining of New Florence flint clay, the type in issue in this case. It is obvious that the questions objected to had no relevancy to such issue, and if answers were required, it would have imposed a great burden upon respondents to inspect their records, and those of a parent Chicago company to provide the extensive requested information, *wherever* located and whatever type of clay. See State ex rel. the Kroger Company v. Craig, Mo. App., 329 S.W.2d 804, 810. The trial court did not err in sustaining the objection to the above interrogatories. Point I is overruled.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD C., is adopted as the opinion of the Court.

All of the Judges concur.