Richard F. SERVENTI et al.

v.

NEW YORK FIRE INSURANCE CO.

MILLVALE SAVINGS AND LOAN
ASSN.

v.

TRAVELERS INDEMNITY COMPANY.

MILLVALE SAVINGS AND LOAN
ASSN.

v.

SPRINGFIELD INSURANCE
COMPANY.

Richard F. SERVENTI et al.

v.

SPRINGFIELD INSURANCE
COMPANY.

Richard F. SERVENTI et al.

v.

AETNA INSURANCE COMPANY.

MILLVALE SAVINGS AND LOAN
ASSN.

v.

AETNA INSURANCE COMPANY.

MILLVALE SAVINGS AND LOAN
ASSN.

v.

NEW YORK FIRE INSURANCE
COMPANY.

Richard F. SERVENTI et al.

v.

The TRAVELERS INDEMNITY CO.

Civ. A. Nos. 64–292–64–299.

United States District Court
W. D. Pennsylvania.

May 5, 1966.

Milton W. Lamproplos, Eckert, Seamans & Cherin, Pittsburgh, Pa., for plaintiffs.

Robert J. Key, New Kensington, Pa., for Serventis.

Anthony J. Bonadio, New Kensington, Pa., for Millvale Savings.

Thomas L. Jones, Pittsburgh, Pa., for all defendants.

WILLSON, District Judge.

The verdict of the Jury favored plaintiffs. Judgments have been entered accordingly. Defendants filed timely post trial motions both for a new trial and for judgments n. o. v. Plaintiffs Richard F. Serventi, Mary E. Serventi, and Gale (Gail) M. Serventi are the owners of a commercial building and a dwelling located in Lower Burrell, Westmoreland County, Pennsylvania. Plaintiff Millvale Savings and Loan Association is the mortgagee of the premises owned by the Serventis. Defendants New York Fire Insurance Company, Travelers Indemnity Company, Springfield Insurance Company and Aetna Insurance Company are the insurers, under policies issued by each, of the premises owned by the Serventis. Each of the policies contained a mortgagee clause in favor of Millvale Savings and Loan. Following a fire loss to the premises, the individual plaintiffs and the corporate plaintiff each sued each of the insurance companies on account of the loss. Since all eight actions involved the same facts, they were consolidated for trial purposes.

Paul J. Trimbur, Inc., was the general agent for Western Pennsylvania of all four companies. Paul A. Bazzano was the agent of two of the companies and the sub-agent under Trimbur, Inc., of the other two. In these cases, all four policies were issued by Trimbur, Inc., with Bazzano countersigning the two from the companies of which he was agent, and Paul J. Trimbur countersigning the other two. Trimbur, Inc., was charged by the companies for the net premiums on a 60 day credit basis; Bazzano in turn was charged by Trimbur, Inc., for the net premium less his commission on a 60 day credit basis. One Louis W. Opall was the agency supervisor of Trimbur, Inc. He and Bazzano inspected the Serventi property prior to the issuance of the policies. Trimbur, Inc., being underwriters, fixed the premium rate. However,

on August 11, 1962, the date of the mortgage closing, the premium rate was undetermined, and the Servientis paid $225 on account of the premium and a binder was issued. Trimbur issued the policies on September 22, 1962. The face amount of each policy was $22,250 with an 80% co-insurance clause.

The evidence showed that the crux of these cases lies in the relationship between Bazzano and Trimbur, Inc., the general agent. Bazzano was the soliciting agent and turned his business—which he had secured—over to Trimbur, Inc., for issuance of the policies. As mentioned, there was a credit arrangement between them for payment of premiums collected by Bazzano. Monthly statements were sent by Trimbur, Inc., to Bazzano covering policies written during the current month; these statements included whatever credits Bazzano might be due because of cancellations or otherwise and also included the unpaid balance from the previous month's statement. During the interval from the writing of the instant policies, September 22, 1962, and December 19, 1962, there were demands made by Trimbur, Inc., upon Bazzano for payment of premiums on these policies and for other balances due. The evidence shows that Bazzano and Trimbur, Inc., were in disagreement as to the indebtedness of Bazzano to Trimbur, Inc., on the running account. The evidence showed, and the Jury found in Interrogatory No. 1 that Louis W. Opall, as agency supervisor of Trimbur, Inc., had learned that Bazzano had received the initial premium payment of $225 at the time of the mortgage settlement. It was apparent from the evidence that Trimbur, Inc., became dissatisfied with its inability to get funds from Bazzano, and so the instant policies were cancelled by a notice sent by mail on December 19, 1962, to plaintiffs. Richard F. Serventi, on receipt of the cancellation notice, immediately contacted Mr. Bazzano with regard to the cancellation. Bazzano, having himself contacted Opall upon receipt of a copy of the cancellation notices, advised Mr. Serventi that he was covered but that the balance of the pre-mium—$494.72—would have to be paid. Bazzano, however, gave Mr. Serventi until after the holidays to pay this balance. The evidence showed that when Bazzano contacted Opall with regard to the reinstatement of the policies or the rescinding of the cancellation notice, Mr. Opall—on behalf of Trimbur, Inc.,—agreed that upon payment of the balance of the premium by the Serventis to Bazzano, the policies would be reinstated. In Interrogatory No. 3, the Jury found under the evidence that Mr. Opall, for Trimbur, Inc., had received knowledge from Mr. Bazzano that the premium balance had been paid to Mr. Bazzano by the Serventis on January 11, 1963.

It is to be emphasized at this point that the cancellation notices came from Trimbur, Inc., only. None of the defendant insurance companies had notice of the issuance of the policies for some period of time thereafter, nor did any of them participate in or request their cancellation. This phase of the business was left entirely to Trimbur, Inc., which sent the cancellation notices in the name of the defendants on December 19, 1962. The testimony of the Trimbur, Inc., fire underwriter was that the cancellation notices were mailed because Trimbur, Inc., had not received payment of the premium from Mr. Bazzano.

We have thus a situation presented in which the general agent Trimbur, Inc., having fixed the premium and written the policies in the first instance, and having mailed the policies to its sub-agent Bazzano, knew that Bazzano had collected the initial premium payment of $225. It was also carrying Mr. Bazzano on an open account with 60 days credit and with more or less a disagreement between them as to what Mr. Bazzano owed Trimbur, Inc. According to Mr. Bazzano, he discussed the reinstatement with Mr. Opall and reached an agreement with him after the notices of cancellation had been sent. Bazzano's testimony to this effect was accepted by the Jury in its answers to Interrogatories Nos. 2 and 3. This conclusion is further supported by the letter written on March 20, 1963, by Mr. Opall

to Mr. Bazzano, indicating that the policies would have been reissued at any time Trimbur, Inc., got its money. Since this is so, and since Trimbur, Inc., knew that Bazzano had received the balance of the premium, the Jury was instructed that it might find for plaintiffs if it found that the understanding between Trimbur, Inc., and Bazzano was that the policies would be reinstated upon payment of the balance of the premium to Bazzano by the Serventis. Mr. Bazzano testified that Mr. Opall had agreed to this.

Thus it seems to the Court now and did so during the trial of the case that Trimbur, Inc.,—because Mr. Opall was its agency supervisor—was required to do more after January 11, 1963, than simply remain silent with regard to the owners Serventis and the mortgagee. The reason is obvious. It knew that Bazzano had the premium money and that the Serventis were relying on that fact. It knew also that Bazzano was disputing the amount owed it. Opall on behalf of Trimbur, Inc., wrote two letters on March 20, 1963. The one to Bazzano—plaintiffs' Exhibit 27—has been discussed. Because of that letter and no doubt because of the relationship between Trimbur, Inc., and Bazzano and what had transpired, Opall came to realize that he must notify the owners that they still did not have insurance. He sent a letter to the owners which referred to the cancellation notice and which read—

"This is to advise that the captioned policies were cancelled by direct notice to you for underwriting reasons, effective December 30, 1962.

"We have notified Mr. Bazzano to either replace these policies or to return the unearned premium to you upon demand."

It is to be especially noticed, however, that he does not tell the owners that the policies were cancelled because of the dispute as to non-payment of premium. The cause given for the cancellation is—"underwriting reasons"—which no doubt to the insured was meaningless. Mr. Opall's letter to the insureds was in the mail but undelivered when the fire occurred on March 20th–21st 1963, and received by the owners the morning after the fire.

▌▌ Under this set of facts, the defendant insurance companies, by their counsel, have attempted to persuade this Court that the cancellation notices were effective and that there was no way to avoid their effect except by the issuance of new policies. It is said also that no one had authority to rescind the cancellation notices or to reinstate the policies. This may be so as a general statement of law, but certainly cannot control in these unusual circumstances. The private instructions and secret rules that are known only by the company and its agent cannot be invoked to defeat the very contract it ostensibly holds the agent out with apparent authority to make. Such rules may be effective in their personal transactions, but should not be extended to third parties who would not be informed of them. Essington Enamel Co. v. Granite State Fire Ins. Co., 45 Pa.Super. 550, (1911). Cases cited by defendants in support of their thesis that a policy, once cancelled, cannot be reinstated, or that a notice of cancellation cannot be rescinded, are distinguishable on their facts. Here the notices of cancellation were prepared and sent not at the instance of nor with the knowledge of the insurance companies but by Trimbur, Inc., on its own initiative and because of its inability to collect the premium from its sub-agent.

▌▌ It is true, as defendants argue, that the procedure for cancellation of insurance policies is set forth in the policies, and that the policies conform to the mandatory provisions set forth by statute [40 P.S. (Pa.) § 636]. However, the policies contain no provision relating to reinstatement of policies or recission of cancellation. This Court knows of no statute or any rule of law—nor has counsel pointed out any—which would prohibit the reinstatement of a fire insurance policy by an oral rescinding of the

cancellation notice. Oral binders are perfectly valid by statute.

■ The Jury found that Opall agreed that upon the happening of a condition, that is upon payment of the premium balance by the Serventis—not to Trimbur, Inc., but to Bazzano—the policies would be reinstated. The exact means by which Opall intended to reinstate the policies are not important; it seems to the Court that a general agent such as Trimbur, Inc., empowered as it was to cancel policies on its own initiative, could agree with its sub-agent that the policies would be reinstated and could take whatever steps were necessary to reinstate the policies. Opall knew that the Serventis had paid Bazzano and that the condition for reinstatement had thereby been fulfilled, but did nothing for more than two months. If Trimbur, Inc., despite its agreement with Bazzano, knowing that the Serventis had paid the full premium on January 11, 1963, pursuant to their understanding with Bazzano, nevertheless did not intend to reinstate the policies, it was bound to quickly and directly notify them that although the premium was paid their policies were still ineffective. But in this situation which called for action on the part of Trimbur, Inc., it did nothing but attempt to collect the debt from its sub-agent. In the meantime the defendant insurance companies had already received their premium from the general agent. Trimbur, Inc., being bound to act and not having acted, defendants cannot at this point rely upon the inability of the general agent to collect the premium from its sub-agent in order to escape liability on the policies.

It is said that silence is golden. Another aphorism is that silence means consent. It is the latter which has significance on the facts presented in the instant case. Mr. Opall failed to take action soon enough. He recognized that on March 20th, but some 60 days late. Although the factual situation is not that of classic equitable estoppel, the principle has application. The Supreme Court of the United States in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618 (1880), three-quarters of a century ago, said:

"The vital principle is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. * * * This remedy is always so applied as to promote the ends of justice."

The principle has vitality today. See Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed. 2d 770, (1959), where the principle was invoked to allow plaintiff to bring an action after the Federal Employers' Liability Act statute of limitations had expired, basically because—"no man may take advantage of his own wrong." See also Kierulff v. Metropolitan Stevedore Co., 315 F.2d 839 (9th Cir.1963), where the principle was invoked to defeat an action brought for infringement of patent.

■■ This case involves the application of Pennsylvania law, as the policies were issued and the loss occurred in Pennsylvania, and the cases are before this Court on diversity. Recently the Supreme Court of Pennsylvania in Nesbitt v. Erie Coach Co., 416 Pa. 89, 204 A. 2d 473 (1964), reviewed the acts of an insurance adjuster in discouraging a plaintiff from consulting a lawyer about a claim for personal injury. He persuaded her that the defendant company would stand responsible for her medical expenses and would make a satisfactory settlement with her when all the facts were in. In reality the insurance adjuster was of the opinion that there was no liability and was simply delaying the affair until the statute of limitations expired. In holding defendant estopped to invoke the bar of the statute of limitations, the Court said at page 95, 204 A.2d at page 476—

"It is based on the principle that 'a person is held to a representation made or a position assumed, where otherwise

inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has in good faith relied thereon.' "

Defendants' final contention is that since only their expert witness, William A. Maybury, gave testimony concerning the actual cash value of the property the instant before the fire, the jury should have been instructed to find the actual cash value of the property to be the figure Mr. Maybury stated, $126,500, instead of what it did find in Interrogatory No. 4,—$92,500. Defendants contend that the judgment entered was excessive by at least $8,000. This contention is unsound both on the facts and in law. It is true that neither plaintiffs' counsel nor plaintiffs' witnesses used the words—"actual cash value,"—but the testimony of plaintiffs' witness Frank Recco clearly was directed to the same thing—the value or worth of the building at the time of the fire, taking into account depreciation. Recco stated this value to be $64,000 or $65,000. The jury was instructed in detail with respect to actual cash value and the testimony of the parties discussed in relation to it. The defendants on the other hand pointed their evidence upward. Because of the 80 per cent co-insurance clause a rather unusual situation was presented to the jury with respect to evidence as to value. The fire destroyed all the contents of the commercial building, and substantially damaged the building, as well as damaged the nearby dwelling. With respect to the building, if it was insured to 80 per cent of its cash value, the property owners would collect the full damage as it had not been repaired and according to plaintiffs could not be. Thus plaintiffs' evidence tended to show a lower figure than defendants—which is unusual. Defendants presented a high value. The jury understood the issue and chose a figure in between—that is it fixed the cash value before the fire as $92,000—which was a sum higher that the value testified to by plaintiffs' witnesses and lower than the value testified to by defendants. Judgment for plaintiffs has been in accordance with the 80 per cent co-insurance clause.

It is believed that the jury fully understood the significance of the 80 per cent co-insurance clause. In its answers to Interrogatories Nos. 4 and 5, it found the actual cash value of the building to be $92,500, and the cost of restoration to be $71,764. The results show that the jury did not accept in toto the valuation testimony of any witness, but it reached a decision within the range of the high and the low value testimony. This is the function of a jury. Compare United States v. 287.89 Acres of Land, etc., a decision by Judge Marsh of this Court in 241 F.Supp. 456, 463(1965). The decision of the jury on values being based upon credible evidence cannot be disturbed by the Court.

The briefs of the learned counsel in these cases reveal considerable study and research in their preparation. However, neither has been able to cite an authoritative decision with respect to the facts in this case. It is to be emphasized that the jury returned a general verdict in favor of plaintiffs accompanied by answers to interrogatories on specific issues. The findings of the jury in all respects are based upon the weight of the evidence.

As to the motions for judgments n. o. v., the verdict being in favor of the plaintiffs, they are entitled to all the inferences which support the verdict. The evidence is to be examined in the light most favorable to the plaintiffs with all conflicts likewise to be resolved in plaintiffs' favor. In following this rule, the conclusion must be that the case was for the jury to decide. It having done so, the Court may not disturb the jury's verdict.

In passing upon the motion for a new trial, significant evidence has been mentioned. In considering all of the evidence it is believed that the jury decided the case based upon a preponderance of evidence which favored plaintiffs. As the clear weight of the evidence favored the plaintiffs, I concur in the decision of the jury.